CARROLL et al. v. CHESAPEAKE & O. COAL AGENCY CO.

(Circuit Court of Appeals, Fourth Circuit. July 17, 1903.)

No. 486.

1. JURISDICTION OF FEDERAL COURTS—DIVERSITY OF CITIZENSHIP—ARRANGE-
MENT OF PARTIES.
     The bill of plaintiff corporation alleged that it was engaged in the
business of selling coal and coke; that it had contracts with defendant
coal companies by which it was to take and pay for all their product at
the mines, to furnish transportation, and to sell the same at prices fixed
by the companies, receiving a stipulated sum per ton for its services;
that by the terms of such contracts defendant companies were not liable
for damages for failing to furnish coal or coke to plaintiff where such
failure was caused by strikes; that in reliance on such contracts plain-
tiff had made contracts for the sale of large quantities of coal and coke,
which could only be supplied from the mines of defendant companies;
that the latter were prevented from furnishing the same by the wrongful
and illegal acts of individual defendants, who were conducting a strike
among the miners, and who, by intimidation and threats, prevented others
from working in the mines. *Held*, that the bill showed such an interest
in plaintiff as entitled it to maintain the suit in its own right for its pro-
tection independently of the coal companies, which, while properly made
defendants, could not be aligned with plaintiff to defeat the jurisdiction
of a federal court, their interests, while perhaps not adverse, being based
on different rights.

2. INJUNCTION—RIGHT TO RELIEF—PARTIES.
     In such suit, to enjoin the alleged illegal acts of the individual de-
fendants, the plaintiff is the real party in interest, and not the defendant
companies, who have no interest in plaintiff's contract rights which it
seeks to protect.

3. SAME—SUFFICIENCY OF BILL.
     While the allegations of such bill do not show that plaintiff has any
interest in the coal or coke produced by the defendant companies until
the same is delivered, they show rights in plaintiff, arising out of its con-
tracts with such companies, interference with which by the individual
defendants will result in irreparable injury to plaintiff, and which en-
title it to equitable relief; it being further shown that such defendants are
not financially responsible.

4. SAME—MISJOINDER OF DEFENDANTS.
     Such bill is not demurrable for misjoinder of parties defendant, plain-
tiff having the right to require the defendant companies to do all in their
power to perform the duty imposed by their contracts to operate their
mines, and to prevent interference with such operation by their co-
defendants, as well as to ask the aid of the court to restrain such un-
lawful interference.

Appeal from the Circuit Court of the United States for the South-
ern District of West Virginia, at Charleston.
    See 119 Fed. 942.

This case comes up on appeal from the Circuit Court of the United States
for the Southern District of West Virginia. The appeal is from a motion re-
fusing to dissolve an injunction. The bill was filed by the Chesapeake &
Ohio Coal Agency Company, a corporation of the state of New Jersey, against
a number of corporations of the state of West Virginia, hereinafter spoken
of as the "coal companies," and the Chesapeake & Ohio Railroad Company,
a corporation both of Virginia and West Virginia, and also against a large

¶ 1. Diverse citizenship as ground of federal jurisdiction, see note to **Shipp
v. Williams**, 10 C. C. A. 249; **Mason v. Dullagham**, 27 C. C. A. 298.

number of persons, citizens and residents of the State of West Virginia, hereinafter spoken of as the "individual defendants." Also against W. P. Rend, a citizen of Illinois; against all the copartners in the Blume Coal Company, citizens and residents of West Virginia; G. W. Purcell and W. B. Wilson, citizens and residents of the state of Indiana; and John Mitchell, a citizen and resident of the state of Pennsylvania. The defendant Rend and the copartners in the Blume Coal Company are included in the term "coal companies," defendants. To this bill the individual defendants interposed demurrers; Purcell, Wilson, and John Mitchell claiming their privilege of suit in the districts of their residence. Their claim was allowed, the demurrer was sustained on this ground, and they were dismissed from the suit. All the other individual defendants filed a joint demurrer to the bill. The grounds of demurrer will be stated hereafter.

In order to understand the grounds of the demurrer, an inspection and statement of the allegations of the bill, or at least an abstract of the allegations, is necessary. The bill proceeds at great length. The complainant is now, and for many years last past has been, engaged in the business of selling coal and coke. A business starting from small beginning, but which now has assumed enormous proportion, amounting in the last coal year to 3,000,000 tons of coal and many hundreds of thousands of coke per annum. Its business is selling coal and coke mined and manufactured by the coal companies defendant. It has been so engaged from the development of these mines in all foreign and American business outside of the capes, and it is almost the exclusive agent in the sale of all coal sold inside the capes east of the mines. It confines its business to the selling of coal and coke mined and manufactured by the defendant companies. At great expense it has built up the business, and sells to consumers all over the world; its business being worth to-day not less than $50,000 per annum. That the Chesapeake & Ohio Railroad Company owns the only means of communicating with the mines of the said companies, and is the only mode by which their products can be carried to market. That their mines are situated in what is known as the "New River Coal Field," located in the New River gorge or cañon, known as the "New River Coal Measures," the coal from which produces a very valuable and high grade of coke, and the coal from said mines is of the highest class steam coal known in the world, and so commands a market in not only this country, but in many European and South American countries. That it has contracts with all of the said coal companies, whereby it sells all the products of their mines and ovens at a price named by the owners of the mines, and becomes responsible to each of them for all deliveries made by each of them, respectively, on board the railway cars at the mines; paying for said coal and coke when so loaded upon the cars, whether sold or not, for a commission of 10 cents per ton. That the said coal companies are not required to deliver to it coal and coke when the employés in their mines are on a strike, or refuse to work. That, in order to sell coal and coke in large quantities, it is necessary to make contracts for deliveries reaching over the whole coal year, which in the eastern market begins on the 1st of April, and in the western market begins on the 1st of May. That it has already sold more than 2,000,000 tons of coal and several hundred thousand tons of coke, to be delivered during the present coal year; a part of this to the government of the United States for the navy, and a large quantity to foreign steamships, and railways and industrial institutions. To fill these contracts it must provide for the transportation of the coal and coke contracted for. For failing to fulfill contracts, for causes hereafter stated, it has already sustained a loss of at least $50,000, and is threatened with greater losses. That, owing to the superior quality of the New River coal, it cannot substitute other coal in its place, except at enormous cost. That, in addition to its present and future losses upon its contracts, it is threatened with the entire loss of its business, which will be hopelessly destroyed, and in this way it would incur irreparable damage. That since 7th of June, 1902, it has been unable to procure but a small amount of coal and coke, because very many, if not all, the employés of the coal companies have quit work, and all these mines, except one, have been idle since that time. The excepted mine has had its tonnage greatly reduced. If these coal companies had not been thus interrupted, their whole

products coming to complainant would have secured it in the fulfillment of all of its contracts.

The bill then at great length and in detail charges: That this cessation of work is due to a secret unincorporated association known as the "United Mine Workers of America." That the purpose of this association is the combination of all the mine workers in America, with a view of controlling the labor in the mines. That to this end the country is divided into districts, the territory covering the states of Virginia and West Virginia being known as "District No. 17." That this district is divided into subdistricts, or locals, which have been organized at the mines of every one of the defendant coal companies. That under the orders of the central organization, communicated to all their subdistricts or locals, the miners engaged in the mines of all the defendant coal companies went on a strike and quit work. Up to that time the miners and mine laborers in the services of these coal companies had been in the enjoyment of wages equal to or greater than that paid in any other coal fields in the United States, the same having been advanced from time to time as the market justified. They were getting good work, making good wages, and were happy and prosperous, and neither of them, individually or with any number of their fellows, complained to their employers on account of their compensation or the conditions and environments surrounding their employment. Not content with this, and as a part of the scheme and method of the organization, the subordinate officers, acting in collusion with the national officers of the organization, besides ordering the strike, they and the miners and mine laborers, members of the subordinate locals, used every effort by persuasion, force, and in many instances by intimidation and threats, to induce others to join with them in the strike. That these miners and mine laborers who have refused to work are now engaged in preventing others from working, and are materially supported and encouraged by their leaders. The complaint then goes on as follows:

"Eighteen. Complainant avers that there are a large number of persons who are willing to work for said defendant coal companies, and who quit work through fear, if they could do so, and be safe and secure against molestation and personal injury from said individual defendants and their confederates, members of said United Mine Workers of America, and that said defendant coal companies can employ and bring from other sections of the country an adequate number of persons to mine and ship their coal and manufacture and ship their coke, if they were assured that they would not be molested or personally injured by the said defendants and their said confederates, members of said organization; but the said individual defendants, members of said organization, and their confederates, also members of said organization, residing in the said New River coal fields, have combined and confederated together for the purpose of preventing all such persons from working in the said mines by the performance of such acts as will operate to accomplish this purpose, even to the extent of doing personal violence, and that the said individual defendants, together with their confederates aforesaid, have inaugurated and been carrying on a system of marching from one colliery to another of the said defendant companies in large bodies, making threatening speeches, and carrying on that sort of tumultuous gatherings and acting in such a menacing manner that they have terrorized and intimidated all persons living in said New River coal field, and who want to work, and all such persons as have been brought into said field by said defendant coal companies from other sections of the country have been scared and put in fear by reason of such conduct, and thereby prevented from working for said coal companies defendant. That they are moving about over said field in the nighttime and daytime in bodies from 200 to 500, gathering together at some places as many as 1,500 persons, using that sort of language, making that sort of demonstrations, and using language so violent that they have placed the whole country in terror, and that there is now throughout that coal field, particularly in the sections around the mines where there is being an effort of work, a reign of absolute terror among the people.

"It is openly charged by said individual defendants in their public speeches made in these large gatherings, in the hearing of persons who are willing to work, and among the people who may reside in the locality where such

meetings are held, that when the strike is over every man who refuses during said strike to join the said organization will be blacklisted, and unable to get work at any trade or occupation anywhere in the United States; and in many cases where persons are desiring to work, and are actually at work, the said individual defendants and their said confederates threaten, in case such persons go to work, or those who are at work do not cease working, that they will do personal violence to them. That on several occasions some of the employés of said defendant coal companies have been shot at from ambush, and driven from their work by reason thereof. That the residence of a justice of the peace living in said New River district, before whom certain cases of unlawful entry and detainer were tried, wherein certain of said coal companies were plaintiffs and members of said order of United Mine Workers were defendants, was recently burned, was set on fire at night and wholly destroyed, because he had decided the said cases in favor of the said plaintiffs."

This conduct upon the part of these individual defendants has interrupted and totally ceased the product of the mines, and, unless the court will interfere, the complainant will be destroyed in its business, will be compelled to lose many thousands of dollars, because of the inability of the coal companies to operate their property and deliver to the complainant the coal and coke called for by its contracts with them respectively, leaving the complainant without redress, because the coal companies are protected by the strike clause in their said contracts, and because each of the individual defendants is wholly insolvent.

The prayer of the bill is as follows: "Individual defendants above named and all other parties be enjoined, restrained, and inhibited from all acts of violence towards men laboring or desiring to labor in the said mines and upon the various plants of said defendant coal companies; and that said individual defendants and all others be inhibited, restrained, and enjoined from marching and parading across the properties of the said coal companies defendants, or either of them, or their assembling in large numbers near, about, or by the property of said coal companies defendants in such manner as to intimidate any person or persons at work or desiring to work for either of said coal company defendants, and that each and every one of said individual defendants and all other persons be enjoined, restrained, and inhibited from interfering with, molesting, or threatening the men in the employ of said defendant coal companies, or persuading them to quit their said employment, or in any way interfering with or disturb the said defendant coal companies in carrying on their business of mining coal, manufacturing coke, and delivering the same on railway cars for shipment to this complainant, by threats, menaces, intimidation, or in any other manner whatsoever. Your complainant further prays that the said defendant the Chesapeake & Ohio Railway Company be restrained from allowing the said individual defendants, or any other persons, from marching on or over its said right of way through or near by the premises and property of the said defendant coal companies in such numbers or in such manner as would tend in any way to intimidate or interfere with the employés of the said defendant coal companies, and from holding meetings on said rights of way where the same passes through the said defendant coal companies' properties; and also from allowing the said individual defendants, or any of their confederates, as set out in this bill, from riding their freight trains from colliery to colliery or point to point within said New River coal field to facilitate their unlawful assemblage in this bill complained of, and to the end that they may be accelerated in their purpose to prevent the said defendant coal companies from resuming work and operating their said mines. Your complainant further prays that each of the said defendant coal companies above named be enjoined, restrained, and inhibited from allowing the said individual defendants, or any other person or persons, from marching, assembling, or doing any act whatsoever on the lands owned or controlled by them that would tend to interfere with the working of the men now employed in the mines of the said defendant coal companies, or from interfering with such persons as may be upon their premises and express a willingness and desire to work for them in their said mines."

To this bill the individual defendants, as we have said, filed their joint and several demurrer. There are stated eight grounds of demurrer. They are: First. To the jurisdiction of the court below as a court of the United States. Second. To the jurisdiction of the court below as a court of equity. (a) Upon its face the allegations of the bill show a want of equity. (b) The complainant is not the real party in interest, but that the coal companies defendants are the real parties in interest. (c) That there is a misjoinder of parties defendants.

Before GOFF and SIMONTON, Circuit Judges, and MORRIS, District Judge.

Charles E. Hogg (S. C. Burdette, on the brief), for appellants.
J. W. St. Clair and W. E. Chilton, for appellee.

SIMONTON, Circuit Judge (after stating the facts as above). The ground of objection to the jurisdiction of the court below as a court of the United States is that the coal companies defendants have interest in the subject-matter of the bill, which will properly align them with the complainant, and that, so aligning them, the said coal companies all being citizens of the state of West Virginia, there will appear a controversy on each side of which are citizens of the state of West Virginia. And for this these defendants rely upon Blacklock v. Small, 127 U. S. 96, 8 Sup. Ct. 1096, 32 L. Ed. 70, and cases there quoted. The principle of these cases is that, where there is a cause of action in a case, and in that cause of action one of the defendants has precisely the same character of interest as complainant, the case cannot proceed in a Circuit Court of the United States if such defendant is a citizen of the same state as any of the codefendants. These cases do not apply here. The cause of action which complainant has against the individual defendants is very different from that which the coal companies may have against them. The prayer for injunction is based upon the allegations in the bill that the complainant is exposed to irreparable injury. The facts to sustain these allegations are that, having contracted to sell all the product of the coal companies defendants, and to guaranty such sales, the complainant, relying upon these contracts, had entered into other contracts for the delivery of coal and coke, amounting to more than 2,000,000 tons of coal and many hundred thousand tons of coke, deliverable in the coal year, to very many parties controlling large interests; that, owing to the actions of the individual defendants, this coal and coke cannot be mined and delivered. Consequently complainant would be compelled to break all of its contracts, especially as it could nowhere else obtain coal of the character it had contracted to deliver. Thus not only would it incur heavy pecuniary loss immediately, but its business would be utterly destroyed in the future. That is the gravamen of the bill, and upon this must stand the prayer for injunction and relief. Now, with the contracts made by complainant with the consumers, the coal companies defendants have no concern whatever. Nor have they any concern with the pecuniary losses met by complainant on these contracts, nor with the time or mode of their fulfillment. When they deliver coal and coke to the complainant, the price is fixed, and its payment is secured at all events. It is true that, if the coal companies do not deliver coal, or are pre-

vented from delivering coal, they suffer injury as well as the complainant. But it is an injury very different from that suffered by the complainant. The complainant suffers at once an irreparable great pecuniary loss by reason of the nonfulfillment of its contracts with the consumers. The coal companies suffer an interruption in their profits, a cessation of sales; but they have on hand their mines, from which coal has not been taken, and on the resumption of work they can recoup. It is only a postponement of sales and of profit and income, not an absolute loss. And in this respect there is no community of interest between complainant and the defendant coal companies. If, therefore, the bill had been so framed as to embrace the complainant and the coal companies as co-complainants, the Coal Agency Company seeking its relief because of its loss on its contracts, and the coal companies because they were deprived temporarily from income, the bill could be well objected to as multifarious. Besides this, the cause of action of the coal companies against these individual defendants would be for an invasion of, and highhanded trespass on, their property, interference with their laborers, and inducing them to quit work; the cause of action being the direct result of the conduct of the individual defendants. The cause of action of the complainant would be because of the indirect result of the action of the individual defendants—a case coming within that class of cases such as the case of Scott v. Shepherd, 2 W. Blackstone, 891, also reported in Smith's Leading Cases, vol. 1, p. 737, and the other cases quoted and discussed by the judge below in his clear and learned opinion, a part of this record. The principle of these cases is that, if one does an unlawful act directed against another, and the immediate consequence of the unlawful act does injury to a third person, he is responsible to the third person, although he never had in contemplation any injury to him. Wherever a man does an unlawful act, he is responsible for all the consequences. See Griggs v. Fleckenstein, 14 Minn. 81 (Gil. 62), 100 Am. Dec. 199; Tarlton v. McGawley, Peake's Nisi Prius Report, p. 270, quoted in the opinion below.

It is true that in one respect the complainant and the coal companies have a common interest, and that is in the uninterrupted operation of the mines; but, as we have seen, for wholly different reasons. The complainant has no share with them in the profits of their respective mines, nor have the coal companies any interest in the losses on the contracts of the complainant. The case may be illustrated by a proceeding on the part of a mortgagee to foreclose his mortgage on land subject to the lien of another mortgage. To such a bill, if the senior mortgagor seeks to foreclose the prior mortgage, all the lienholders subsequent to him must be made parties (Bates on Federal Procedure, § 359), and they can be made parties defendant. The interest of the two mortgagees in one respect are the same—both want their money by foreclosure and sale. Yet such a bill filed in this court has been and can be sustained, even if the subsequent lienholders and the mortgagor, defendants to the bill, are citizens of the same state. See, also, Hotel Co. v. Wade, 97 U. S. 20, 24 L. Ed. 917.

Besides this, the complainant is entitled to sell all the coal mined and coke made by these coal companies, and is interested in securing the largest quantity possible. It has a right to ask that the coal companies exhaust all means of securing a supply of coal. To this end it prays that the coal companies be restrained from permitting the individual defendants and any other persons from assembling, marching, or doing any act on their own lands which will interrupt the production of coal. The prevention of these unlawful acts is not within the power of the complainant, and cannot be successfully effected without the co-operation of the coal companies, and such co-operation will be more readily and successfully exercised if it meet with the sanction and be given under the mandate of this court. Even were it the case that no relief was sought against the coal companies, and that they have an interest in the result, still, if the complainant has grounds for relief against the individual defendants—a ground peculiar to itself, a cause of action that it can sustain—then these coal companies are not necessary parties to the bill, and it may be dismissed as against them, the action in the meantime proceeding against the individual defendants. Wormley v. Wormley, 8 Wheat. p. 450, 5 L. Ed. 651; Removal Cases, 100 U. S., p. 469, 25 L. Ed. 593.

The other grounds of demurrer go to the jurisdiction of the court as a court of equity: (a) Upon its face the allegations of the bill show its want of equity. (b) The complainant is not the real party in interest; the coal companies are the real parties in interest. (c) Misjoinder of defendants.

We will not take these up in their order, but will first inquire, is the complainant the real party in interest? As we have seen, the gravamen of the complaint of the bill is that the complainant, upon the faith of the contracts with the coal companies, had, upon its own responsibility, and at its own risk, entered into contracts with very many consumers of coal and coke for delivery during the coal year; that by reason of the action of the individual defendants the supply of coal was cut off or destroyed, and in consequence thereof great loss, present and future, has come upon the complainant. It complains of its loss, and seeks relief from it. It is true that in a sense the complainant is agent for the coal companies, and in a sense, as their agent, disposes of the coal; that by the terms of its contract with the coal companies, immediately upon the delivery of the coke and coal on the cars the complainant becomes liable for its price to the coal companies, and pays this price at all events. With the disposition of the coal, the parties to whom it is to be delivered, their solvency or insolvency, the time of delivery, and the consequences of nondelivery, the coal companies have no concern whatever. They do not contract with the consumers; they do not know the consumers; they are not informed of the names of the consumers; they authorized no contract with them. All these are the acts and concern of the complainant, made and assumed by it as its own contracts, for the nonperformance of which it is alone responsible. If, therefore, the complainant has any cause of action at all because of the loss thus occasioned to it, it has such right of action itself against

the individual defendants, and could not seek its remedy in the name of or through the coal companies, if for no other reason, because the loss for which they seek relief was no concern of the coal companies.

Is there equity in the bill? It is contended that the bill does not disclose any interest of the complainant in the mines or products of the individual defendants; that the complainant has no interest in the coal and coke until it is delivered on the railroad, when, and when only, its property interest in the coal and coke arises; and that the bill does not show any contract between the complainant and the coal companies to deliver coal, either as to time or quantity, only to sell such coal as it is delivered. It is impossible to read this bill of complaint without seeing that it is based on the fact that the complainant has a contract with each of the coal companies for the delivery to it of all the coal such company can mine. It must be remembered that the case of the complainant against the individual defendants is not on the contracts, nor for a breach of the contracts. It arises because of these contracts. So that the terms of the contracts and their conditions need not be set forth. It is enough if it appear that such contracts exist. The bill alleges that complainant has been engaged for years in selling coal and coke. That this business has been confined to selling the coal and coke produced by the coal companies defendants; that it is the only person who sells the coal and coke produced by them. The complainant has contracts with all of the coal companies defendants, and that under and by virtue of said contracts it has in this one year contracted to deliver to consumers in this country and elsewhere 2,000,000 tons of coal and several hundred thousand tons of coke. The bill and its prayer show that these coal companies were being operated, and that all their operations were suspended by the action of the individual defendants, and that the loss thereby occasioned to complainant is irreparable, because "the said defendant coal companies are not required to deliver to your complainant coal and coke when their employés in their mines are on a strike or refuse to work." Is not the inference from these statements irresistible that all the coal companies defendants were engaged in mining and manufacturing coal and coke; that they were bound to deliver to the complainant all the results of their operations; that, in consideration of and in reliance upon this, complainant had engaged in large contracts for delivery, and had assumed vast responsibility and is so exposed to great loss? Is it not also clear that the complainant has direct and immediate interest in the working of the mines and in the use of the ovens in the delivery of the coal and coke, even if it has no property in the coal and coke until it is actually delivered?

As to the misjoinder of parties defendants. As has been seen, the complaint of the bill is great loss to it by reason of the inability to receive coal from the mines of the coal companies. This inability arises from the fact that the mines are not worked. It is the duty of the coal companies to have the mines worked. That of the individual defendants not to obstruct this operation. Discharging their duty, the coal companies should exhaust effort in obtaining workers

for their mines, and in restraining and preventing the obstruction of the work. Non constat that the action of the individual defendants may not have been taken because of some acts of omission or commission on the part of the coal companies. At least complainant has the right to know about this, and the coal companies have the right to disavow and disprove it. Until this is done, the fault may lie with the coal companies and the individual defendants, with either or both. Besides this, as the case of the complainant is because of these contracts with the coal companies, it would appear that these companies are proper if not necessary parties.

The individual defendants have concluded at this stage of the case to rest their defense on the demurrer. They admit for this purpose the truth of the facts stated in the bill. Assuming, therefore, that these facts are true, that the individual defendants have either committed or sanctioned or encouraged the acts of gross violence and lawlessness contained in the bill, the court below had no alternative but to issue its injunction.

The decree of the court below is affirmed.