### GABLE et al. v. VONNEGUT MACHINERY CO. et al.

(Circuit Court of Appeals, Sixth Circuit. July 19, 1921.)

No. 3450.

1. **Courts ⚌317—Plaintiff and manufacturer held to have identity of interest in suit to enjoin interference with operation of factory.**

   In a suit against a manufacturer, its striking employees, and others to enjoin interference with the operation of the factory, brought by a corporation of another state, alleging that for many years it had been and then was the agent of the manufacturer, etc., plaintiff and the manufacturer *held*, under the evidence, to have such identity of interest as required their alignment on the same side for purposes of jurisdiction.

2. **Courts ⚌289—Federal court without jurisdiction to enjoin interference with operation of factory, though products sold in interstate commerce.**

   Though the greater part of a manufacturer's business was the sale and delivery of articles manufactured by it to points outside the state, requiring their transportation and sale in interstate commerce, acts in connection with a strike, obstructing the operation of the plant and only incidentally and indirectly affecting interstate commerce, do not constitute interference with interstate commerce, under the Sherman Act (Comp. St. §§ 8820–8823, 8827–8830), and the Clayton Act, which may be enjoined by a federal court, in the absence of diversity of citizenship, as manufacturing is not commerce.

3. **Monopolies ⚌24(1)—Private parties cannot maintain suit under Sherman Act.**

   Private parties cannot maintain a suit to enjoin acts in restraint of interstate commerce under Sherman Anti-Trust Act, § 4 (Comp. St. § 8823).

4. **Monopolies ⚌24(1)—Private person can enjoin act in restraint of trade only where immediately directed against interstate commerce.**

   Though under Clayton Act, § 16 (Comp. St. § 8835o), a private party may maintain a suit to enjoin acts interfering with interstate commerce,

⚌For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the requirement that the acts complained of must be immediately directed against interstate commerce is not done away with.

5. **Courts** ⬅️280—**Bill and cross-bills for injunction should be dismissed, without waiting for final hearing, when court without jurisdiction.**

Where, in a suit to enjoin interference with the operation of a factory in connection with a strike, it appeared on application for a temporary injunction that the District Court did not have jurisdiction, either by reason of diverse citizenship or because interstate commerce was involved, the bill and cross-bills should have been dismissed, without waiting for final hearing.

Appeal from the District Court of the United States for the Western Division of the Northern District of Ohio; John M. Killits, Judge.

Suit by the Vonnegut Machinery Company against William Gable and others. From an order granting a temporary injunction (263 Fed. 192), the defendant named and others appeal. Reversed and remanded, with directions.

Rob V. Phillips, of Toledo, Ohio, for appellants.

Richard D. Logan, of Toledo, Ohio, for appellee Vonnegut Machinery Co.

Harold W. Fraser, of Toledo, Ohio (Marshall & Fraser, of Toledo, Ohio, on the brief), for appellee Toledo Machine & Tool Co.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

PER CURIAM. Appeal from a temporary injunction in a strike suit. The strike here involved is a sequel of the strike at the Overland plant, at Toledo, Ohio, involved in Quinlivan v. Dail-Overland Co., 274 Fed. 56, No. 3434 in this court, this day decided. The Toledo Machine & Tool Company, which is an Ohio corporation, was operating at Toledo, Ohio, a plant for the manufacture of machinery and tools. On August 13, 1919, a considerable force of its employees walked out, thus inaugurating a strike.

On the 16th day of January, 1920, the Vonnegut Machinery Company, which is an Indiana corporation, doing business in that state, claiming to have contracts with the Tool Company for the manufacture and sale of a large amount of machinery, whose manufacture and delivery were interfered with by the Tool Company's strike, filed its bill in equity in the court below. The original bill is not in the record. An amended bill was filed January 21, 1920. The defendants therein were the Tool Company, two labor unions, and a number of individuals alleged to be either officers or representatives of one or the other of the unions, or concerned as pickets or otherwise with the strike; the defendants other than the Tool Company being alleged to be citizens and residents of the Western division of the Northern district of Ohio. It is alleged that the individual defendants, conspiring with each other and with others unknown, had assembled at the plant of the Tool Company and had obstructed and interfered with the performance of said contracts and with the shipment of said materials in interstate commerce, and unless restrained and enjoined would continue to do so; that to facilitate such practices they had erected a shanty on the property of the Tool

Company, wherein they congregated to keep warm; that they gathered at or near the entrance to the Tool Company's plant at the times when its employees were entering and leaving, and called them vile and offensive names, and heckled and nagged at such employees, and so annoyed and frightened them that they had threatened to quit their employment unless such abuses were stopped; that by similar actions the individual defendants were by threats and intimidation attempting to prevent other persons from seeking employment with the Tool Company.

It further alleged that the Tool Company operated its factory on the "open shop" plan, refusing to, and being bound by contract not to, discriminate between so-called union labor and non-union labor, but to operate an "open shop"; that defendants other than the Tool Company, by the strike activities referred to and otherwise, were interfering with, hindering, and obstructing the performance of the contract between the Tool Company and its employees, were seeking through such unlawful conduct and through oppression, fear, and intimidation to induce either the Tool Company or its employees to break the same, and by such unlawful conduct have interfered with the Tool Company in the performance of its obligations to the plaintiff, and have been and were then unlawfully obstructing the Tool Company in the delivery of the machinery, etc., to plaintiff and the shipment of the same in interstate commerce.

The prayer of the amended bill, as to the Tool Company, is that it be restrained from interrupting the manufacture, delivery, and shipment of the machinery and tools for whose manufacture, etc., the Tool Company was alleged to be under contract, and that the Tool Company be directed to employ such force of workmen as should be necessary to enable such production and to complete and carry out its alleged contract with plaintiff for such manufacture and delivery.

As to the labor unions and individual defendants, the prayer, speaking generally, was for restraint against interference with and obstruction of the Tool Company's business of manufacturing the machinery in question, from congregating about the Tool Company's plant and about the homes of its employees, from abusing, annoying, threatening, and intimidating that company's employees, or those desiring to become such, from attempting to induce employees to violate their contracts of employment, and from maintaining the shanty referred to.

The asserted grounds of federal jurisdiction are diversity of citizenship and the existence of a conspiracy to restrain interstate commerce, On the filing of the amended bill, the court below overruled a motion by the defendants other than the Tool Company to dismiss the suit for lack of either jurisdiction, cause of action, or good faith, and, upon the bill of complaint and testimony both oral and by affidavit, granted a restraining order against the defendants other than the Tool Company substantially as prayed.

The Tool Company filed an answer and cross-bill, admitting (with one exception not presently important) all the allegations of plaintiff's bill, specially averring its open shop policy, its contract with its employees to maintain the same, and the attempts of the labor and union defend-

ants, by the strike complained of, to break up the "open shop" and to unionize the plant, substantially as set forth in the bill—asking substantially the same relief as did the original bill. The other defendants filed answer denying all unlawful conduct charged against them, asserting the continued existence of a strike and a dispute concerning terms and conditions of employment, and collusion between the Tool Company and the Vonnegut Company in bringing the suit for the sole purpose of obtaining jurisdiction on the part of the federal court, in preference to that of a state court. They joined issue on the cross-bill, after renewing motion to dismiss the original bill, and moving to dismiss the Tool Company's answer and cross-bill, for reasons including collusion and lack of jurisdiction.

Upon oral and other testimony taken January 26 and 27, a temporary injunction was ordered on February 7, 1920, against the defendants (except the Tool Company, one labor defendant, and one union defendant), conforming substantially to the prayer of the cross-bill and the terms of the restraining order. This appeal is from that order of injunction.[1]

On March 21, 1921, the Tool Company filed in this court a motion to dismiss the appeal, on the ground that the questions raised thereby had become moot by reason of the asserted fact (of which the movant offers to make proof) that each of the appellants has long since entered into contracts of employment elsewhere, and is now neither in the employ of nor seeking employment with the Tool Company. The appellants have not formally replied to this motion. We think the question of the jurisdiction of the District Court should be disposed of.

[1] In our opinion jurisdiction was lacking so far as it depended upon diversity of citizenship, for we think that upon this record the Tool Company must be aligned as a party plaintiff, thereby destroying the alleged diversity. The bill alleges that plaintiff "for many years has been and is now the agent of the defendant Tool Company in that part of the state of Indiana above described, and it has built up and now has and enjoys a large and extensive business in buying, selling, and dealing in machines and machinery, and particularly a large and profitable business in buying, selling, and dealing in presses, tools and equipment manufactured by the Tool Company." The Tool Company's secretary and treasurer testified thus:

"Q. The Vonnegut people are your sales agents, are they not? A. They are. Q. On commission basis? A. They are."

The vice president and sales manager testified that the Vonnegut Company—

"have the right to sell goods in certain territory. They get a price from us and sell at that time [price?] and when they pay their bills they deduct 7½% commission;" that the Tool Company has "but one price, and when we quote them the price they are supposed to quote that price and sell our machines at that price. * * * Of course, when we quote the Vonnegut, it is necessary that they are to quote that price, or there would be a confliction of price from one place to the other. Q. So as a matter of fact you do fix the price, don't you? A. Yes, sir. Q. And all the Vonnegut Machine Company

---

[1] For opinion of the District Court, see 263 Fed. 192.

get out of your business is 7½ per cent. commission for transacting this business for you, don't they? A. So far as I know; yes, sir." (It is not suggested that any one had better means of knowledge than this sales manager.)

True, the Tool Company in its answer to the bill does not admit that the plaintiff has been or is its agent, but says that for many years plaintiff has purchased and sold tools and equipment manufactured by this defendant, and has built up and now enjoys a large and extensive business in such tools and equipment; that it never has had and now has no power and authority to bind the plaintiff—doubtless meaning the Tool Company. But the case was not heard on pleadings alone, and the testimony of the Tool Company's two officers, as already given, is opposed to the answer. It is also true that in a portion of the bill of complaint, later than that from which we have quoted, plaintiff alleges that it has from time to time during the past six months ordered, contracted, and purchased from the Tool Company, and the latter has contracted to manufacture and deliver a large number of presses, tools, dies, and other material and machinery manufactured by the Tool Company—specifying in that connection as among the machines "covered by said contracts," certain presses and dies purchased by plaintiff for the Nordyke & Marmon Company, at an agreed price of $144,000; also a press for another Indiana company at a price of $32,850,'as well as six presses ordered by plaintiff "for its own use" (the price thereof not being mentioned nor the damage, if any suffered by delay in their furnishing) and that the "total amount of the contracts *or orders*[2] given by plaintiff to the  *  *  *  Tool Company and accepted by said Tool Company, is in excess of $203,000." True, also, the Tool Company's vice president and sales manager, on examination by its counsel, said that "the Vonnegut Machinery Company have no agency contract with us," which conflicts with his previous testimony, unless the witness was seeking to distinguish between a written and a verbal agreement. He also states:

"We look to them for our compensation," and charge to the Vonnegut Company all the work done "on their orders."

But the fact that the Tool Company looked to the Vonnegut Company for its "compensation," and accordingly charged to that company the work covered by its orders, is not inconsistent with a purely agency commission contract. In this view of the case there is nothing inconsistent with the existence of an agency contract in the statement "the Vonnegut Machinery Company buy and sell our machines," for in that same connection it appears, for example, that while the Nordyke & Marmon order may have been charged to the Vonnegut Company, the sales manager testified that some of the Tool Company's negotiations were carried on through the Vonnegut people and some directly with the Nordyke & Marmon Company," and that the "Vonnegut people were to receive only the 7½ per cent. commission on this contract." Naturally the Tool Company makes its deliveries according to "instructions from the Vonnegut Machinery Company."

[2] Italics ours.

The suggestion is made that the Tool Company does not always know what price the Vonnegut Company receives for the Tool Company's goods. But, considering the entire testimony, this can only mean that, if the Vonnegut Company receives a higher price than the Tool Company charges, the former violates its agreement with the latter. That the plaintiff has no authority to bind the Tool Company does not negative identity of interest in this litigation. However the relation between the plaintiff and the Tool Company may be labeled, when the entire record is taken into account, including not only the Tool Company's testimony taken as a whole, considered in connection with the sworn allegations of the bill, but the fact that no representative of plaintiff has testified regarding its relation with the Tool Company or on any other subject, we think there is disclosed an identity of interest between the two corporations in respect to the filling of the orders given by the Vonnegut Company to the Tool Company, and thus, in restraining the strike which prevented or obstructed manufacture, and that this identity of interest requires the aligning of the two corporations as plaintiffs for purposes of jurisdiction. Dawson v. Columbia Trust Co., 197 U. S. 178, 180, 25 Sup. Ct. 420, 49 L. Ed. 713; Steele v. Culver, 211 U. S. 26, 29, 29 Sup. Ct. 9, 53 L. Ed. 74; Niles-Bement Co. v. Iron Moulders Union, 254 U. S. 77, 41 Sup. Ct. 39, 65 L. Ed. ——; Davis v. Henry (C. C. A. 6) 266 Fed. 261.

We deem the principle of the two cases last cited in point.[3] In the Niles-Bement Case an anti-strike injunction was asked upon the ground that the petitioner had manufacturing contracts with the Tool Works, the performance of which was being delayed by the strike. It was held that there was such an identity of interest between plaintiff and the Tool Works as required their alignment as coplaintiffs. In Davis v. Henry a salesman for a manufacturing corporation, who received part payment in commissions, filed a bill to enjoin the striking employees of the corporation from interfering with other employees—the corporation's ability to fill the salesman's orders, and thus to earn his commission, being seriously threatened by the strike. It was held that the salesman had no such interest in restraining the strike as to permit the filing of the bill without making the employing corporation a party, which would result in destroying diversity of citizenship. It is true that the instant case differs from the Niles-Bement Case, in that there the defendant corporation was, through stock ownership and otherwise, subject to the control of the plaintiff, and that the latter asked no relief against the former, and that the case before us differs from Davis v. Henry in that there the manufacturing corporation had not been made a party at all, and the goods sold were not charged up to the salesman or he apparently made responsible therefor; but the differences are in degree only.

In both cases cited, as well as in the instant case, the plaintiff was attempting to restrain strike activities against the manufacturing plant because they interfered with plaintiff's rights, through his or its relations with the manufacturer to have the manufacturing carried on.

[3] The decisions of the Supreme Court in the Niles-Bement Case and of this court in Davis v. Henry were made since the instant case was decided below.

The controlling principle involved in each of the three cases is to our minds essentially the same, viz. that there was no collision of interest between the plaintiff and the manufacturer, but that such interests were identical. If there was no collision of interest, the fact that in the instant case the manufacturer was made a party, and that relief was in form asked against it, is not important.

There is here no contention that the Tool Company was not an indispensable party. Indeed, such contention would be unsustainable in view of the allegations both of the bill and cross-bill, that the purpose of the strike was to unionize the plant. Niles-Bement Co. Case, supra; Davis v. Henry, supra. The Tool Company had a direct and predominant interest in putting an end to the strike and in protecting itself against the alleged attempt to unionize its plant. The plaintiff had an interest in the operation of the plant to the extent that the orders in which it was interested be filled, but its interest went no farther. Plaintiff had thus no special or peculiar interest in ending the strike. If it was injured thereby, so was the Tool Company, and in the same way (although in other ways as well), viz. its inability to fill its contracts, resulting in the loss of profits. The two corporations were "privileged to assert their respective interests upon the same grounds." The case is to our minds clearly distinguishable from cases like C. & O. Agency v. Carroll ([C. C.] 119 Fed. 942; Id., 124 Fed. 305, 61 C. C. A. 49), and the other cases discussed in Davis v. Henry, supra, at pages 263 and 264.[4]

We find nothing in the record to indicate collision of interest between the two corporations. The fact that the bill formally asked relief against the Tool Company is not enough to show such collision. The allegation of the Tool Company's default[5] appears strained and artificial, especially in view of the record in the Overland Case, introduced in evidence by the Tool Company, which showed on its face the conclusion of the trial court that the public authorities could not (or would not) give effective protection to the Overland. Indeed, the Tool Company's answer alleges that it had done everything it could to overcome the interference caused by the strike, and has appealed to the public authorities of Toledo without avail, and that the latter have not only

[4] The Toledo Company asserts in its answer that it had for many years made a practice of inserting in all of its letters a statement that all orders, contracts and agreements are subject to delays arising from strikes, fires, accidents, or causes beyond its control; that its practice in that regard was known to the plaintiff and that such stipulation was understood and agreed to be a part of the contracts and orders, whereby delays in the performance thereof not within the Tool Company's reasonable control were excusable. The record contains no assertion that plaintiff was not entitled to the same immunity as between it and those to whom the machinery was to be shipped.

[5] The only general allegation which may plausibly be thought to indicate collision is that of repeated demands by plaintiff on the Tool Company to carry out its contracts and the latter's refusal to do so. The Tool Company's only specifically asserted default is a neglect, refusal and failure to demand of the authorities of the city of Toledo, or of the county or state, suitable and proper protection to enable it to conduct its business and fulfill its contract obligations without interference by defendants other than the Tool Company or those in sympathy with them.

done nothing to protect the Tool Company and its employees and its rights, but, on the contrary, have assisted the defendants in the performance of alleged unlawful acts and practices.⁶ However, it would seem enough to say that there was no evidence whatever of any failure on the Tool Company's part to try to get protection. The allegations in the bill of plaintiff's inability to procure the machinery in question elsewhere than from the Tool Company do not affect the question of alignment of parties plaintiff.

[2] In our opinion the District Court did not obtain jurisdiction of the case as one involving interstate commerce. The only allegations in the bill pertinent to that question are that the greater part of the Tool Company's business is the sale and delivery of articles manufactured by it to points outside the state of Ohio, requiring the Tool Company to transport such articles and deal therein in interstate commerce; that the practices of the labor and union defendants complained of have restrained and do restrain interstate commerce and trade unlawfully, in that such acts interfere with, hinder, and obstruct the performance of the contract between plaintiff and the Tool Company and the delivery in interstate commerce of the machines, etc., purchased by the former from the latter; that certain of the defendants have unlawfully interfered with persons en route from points outside the state of Ohio to the Tool Company's plant. (We find no testimony supporting this latter statement.)

But all these statements combined fall short of alleging interference with interstate commerce under either the Sherman or Clayton Acts. Neither of these statutes furnishes a remedy against acts merely because they incidentally and indirectly affect interstate commerce; they apply only to acts which directly and immediately relate thereto. Manufacturing is not commerce. None of the cases cited support the theory that a manufacturer may invoke the jurisdiction of the federal court merely because a strike interferes with the manufacture of his products which are sold generally in interstate commerce. Loewe v.

⁶ Presumably the Tool Company's attitude in that regard was not unknown to plaintiff, especially as its relations with the Tool Company were intimate enough to enable it to attach to its amended bill 26 affidavits taken, as testified to by the Tool Company's secretary, "under the instruction of some officer of that company [the Tool Company] and a notary and employee of the company." The secretary says that "one of the attorneys of the company, who represented it at that time, prepared the affidavits" and "took charge of them after they were taken." Neither the attorney in question, nor the notary was produced as a witness. The attorney referred to did not appear as such in the instant case, so far as appears. Under these circumstances, the fact that the Tool Company's secretary (who gave the affidavits to the attorney a few days after they were taken) did not personally know how plaintiff got them and gave no instructions "as to what was to be done with them, nor did he [the attorney] say why he wanted them," and that the secretary did not know at the time that the Vonnegut Company was "proposing to bring an action against us as defendants and those other defendants," and says the affidavits "were taken because we had expected at some time or other something would be brought up whereby we would need something of that kind and so I instructed that they would be taken," does not tend to negative the apparently artificial character of the charge of wrongful refusal on the part of the Tool Company to ask for protection against the strike.

Lawler, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815, involved a boycott of a manufacturer's goods on his refusal to unionize his shops, and to prevent the sale of such goods in states other than his own. Gompers v. Buck-Stove & Range Co., 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874, also involved a boycott of a manufacturer's goods which was designed to interfere with their sale in other states. Eastern Lumber Assn. v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788, involved a combination between retail associations .throughout the country to prevent wholesale dealers from selling directly to consumers, and thus directly involving interstate commerce.

[3, 4] Private parties cannot maintain a suit for injunction under section 4 of the Sherman Anti-Trust Act (Comp. St. § 8823). Paine Lumber Co. v. Neal, 244 U. S. 459, 37 Sup. Ct. 718, 61 L. Ed. 1256. But section 16 of the Clayton Act (Act Oct. 15, 1914, c. 323; C. S. § 8835o) supplements the Sherman Act by giving a private party a right to maintain suit for injunction. Duplex Co. v. Deering, 254 U. S. 443, 465, 41 Sup. Ct. 172, 65 L. Ed. ——. It does not, in our opinion, do away with the requirement that the acts complained of must be immediately directed against interstate commerce. There is nothing in the Duplex Case to the contrary. That case involved a country-wide secondary boycott of goods manufactured in Michigan and shipped therefrom to New York. The acts complained of had nothing to do with the conduct and management of the factory in Michigan, but related to interference with the hauling, handling, installation, and repair of plaintiff's goods elsewhere, thereby discouraging their movement in interstate commerce.

[5] The record before us is barren of evidence that the object of the strike was to interfere with interstate commerce. So far as appears, either directly or inferentially, the strikers' only object was to obstruct the operation of the Tool Company's plant. The fact that shipment was interfered with, only because goods were not manufactured, merely incidentally and indirectly affected interstate commerce. Our conclusion is that the District Court failed to acquire jurisdiction either by reason of adverse citizenship or because interstate commerce was involved, and that the order for injunction was thus a nullity. The bill and cross-bill should have been dismissed, without waiting for final hearing. Harriman v. No. Securities Co., 197 U. S. 244, 287, 25 Sup. Ct. 493, 49 L. Ed. 739; Lyons v. Empire Fuel Co. (C. C. A. 6) 262 Fed. 465, 472. Such action is now especially appropriate in view of the contention that the meritorious questions have become moot.

This case differs radically from the Overland Case, in that here the bill and cross-bill were not taken as confessed, but testimony was heard, the lack of jurisdiction in a federal court appeared on the face of the bill, and the allegations of the cross-bill would not support original jurisdiction in that court. The conclusion of lack of jurisdiction makes it unnecessary to consider the merits of the case.

The order complained of is reversed, and the record remanded to the District Court, with directions to dismiss the bill of complaint and cross-bill.