UNITED LEATHER WORKERS' INTERNATIONAL UNION et al. v. HERKERT & MEISEL TRUNK CO. et al.*

(Circuit Court of Appeals, Eighth Circuit. October 19, 1922.)

No. 5865.

1. Commerce ⊙⇒16—"Interstate Commerce" defined.

"Interstate commerce," as used in the Constitution and the Anti-Trust Act (Comp. St. § 8820 et seq.), comprehends every contract, trade, and dealing between citizens of one state and those of another which contemplates the transportation of goods, persons, or information from one state into another, and every initiatory, negotiating, and intervening act of the parties to that trade or deal, from the time the intercourse

---

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Rehearing denied December 23, 1922.

relating to it commences until the transportation and delivery have been completed.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. **Monopolies ⬅14—Combination to prevent manufacture of article of commerce held in "restraint of interstate commerce."**

A combination or conspiracy to obstruct and prevent the manufacture of articles of commerce which the makers, in the usual course of their business, manufacture on orders from customers, largely in other states, or which they have contracts to make and ship in interstate commerce, is one in restraint of such commerce within Sherman Anti-Trust Act, § 1 (Comp. St. § 8820).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Restraint of Commerce.]

3. **Injunction ⬅55—Right to continue business in interstate commerce is property right.**

The right of persons engaged in interstate commerce to keep their business running and to the continuous flow of their currents of interstate commerce are property rights which they are legally entitled to exercise and in which they are entitled to protection.

4. **Monopolies ⬅21—Conspirators whose acts necessarily and directly restrain commerce are chargeable with intending that result.**

Persons purposely engaging in a conspiracy which necessarily and directly operates to restrain interstate commerce, which the Anti-Trust Act is designed to prevent, are in legal contemplation chargeable with intending that result.

5. **Conspiracy ⬅4—To use unlawful means to accomplish lawful purpose unlawful.**

A combination or conspiracy to use unlawful means to accomplish a lawful purpose is unlawful.

6. **Monopolies ⬅24(1)—Execution of conspiracy in restraint of interstate commerce may be enjoined by federal court.**

Execution of a conspiracy which will have the necessarily intended direct and inevitable effect of stopping or drastically restraining interstate commerce may lawfully be enjoined by a federal court.

Stone, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Missouri.

Suit in equity by the Herkert & Meisel Trunk Company and others against the United Leather Workers' International Union and others. Decree for complainants and defendants appeal. Affirmed.

For opinion below, see 268 Fed. 662.

John P. Leahy, of St. Louis, Mo. (Lena Frank, of St. Louis, Mo., on the brief), for appellants.

Charles A. Houts, of St. Louis, Mo. (Mat J. Holland, of St. Louis, Mo., on the brief), for appellees.

Walter H. Saunders, of St. Louis, Mo., amicus curiæ.

Before SANBORN and STONE, Circuit Judges, and MUNGER, District Judge.

SANBORN, Circuit Judge. This is an appeal by United Leather Workers' International Union, Local Lodge No. 66, an association of about 600 union workmen of St. Louis, Mo., and about 25 individual

members of that association, defendants below, from a final decree of the District Court which enjoined them from compelling or inducing any of the employés of the plaintiffs, corporations of Missouri, whose places of business were in St. Louis, by threat, intimidation, force, abusive, violent or insulting language, the threat of superior numbers or pickets, by assaulting, threateningly accosting, laying hands upon, by following them to their homes, or intimidating the members of their families, to leave the service of the plaintiffs or to fail or refuse to perform their duties to the latter as such employés.

The plaintiffs were five corporations of the state of Missouri, who for a long time had been and were on and prior to the 10th day of April, 1920, engaged in selling, on orders from their customers, the great majority of whom were residents and citizens of other states than Missouri and had their places of business therein, manufacturing and shipping to such customers at their places of business, trunks, leather goods, and bags, which by such orders the customers bought and directed the plaintiffs to make and ship to them.

[1] This suit was founded on section 1 of the Sherman Anti-Trust Act, which reads:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal." Comp. Stat. § 8820, Act of July 2, 1890; 26 Stat. 209, c. 647, § 1.

The complaint of the decree is that the evidence is insufficient to sustain it because, although it conclusively established the facts that the defendants conspired to and did by unlawful means such as too many pickets, assaults, threats, and intimidation of employés and those seeking employment of the plaintiffs, restrain and stop the theretofore continuous streams of the plaintiffs' interstate commerce, and prevent the plaintiffs' performance of their interstate commerce contracts of sale, they did this by preventing the plaintiffs from manufacturing the articles they had contracted to sell, make, and deliver in interstate commerce, and because the defendants stopped the flow of this interstate commerce in this way for the purpose of compelling the plaintiffs to employ union men only and to comply with other demands of the defendants.

The ordinary course of business of parties selling, making, and shipping goods on orders of their customers is to furnish such customers with lists of the goods they offer to make and sell and the prices thereof, for the customers to send to the vendors written orders for the goods they wish to buy at those prices, the receipt and acceptance of which the sellers acknowledge in writing. Thereupon such orders become legal and binding contracts on the part of the sellers to make and ship the articles to the customers at the places specified therein and on the part of the customers to receive and pay the specified prices for the goods. Rearick v. Pennsylvania, 203 U. S. 507, 511, 27 Sup. Ct. 159, 51 L. Ed. 295. The evidence was that when the defendants stopped the interstate commerce of the plaintiffs by stopping the making of the goods their customers had ordered the plaintiffs had such unfilled orders or contracts for the sale, manufacture,

and shipment to their customers at the latters' places of business in states other than Missouri of these respective values: Herkert & Meisel Trunk Company, $200,000; James A. Quirk & Co., $15,000; F. A. Kolb Trunk & Case Company, $5,000; the Stability Leather Goods Company, $32,000; P. C. Murphy Company, $75,000—aggregating $327,000. The Supreme Court has declared that—

"Where the contract is for the sale of the article and for its delivery in another state, the transaction is one of interstate commerce, although the vendor may have also agreed to manufacture it in order to fulfill his contract of sale. In such case a combination of this character would be properly called a combination in restraint of interstate commerce, and not one relating only to manufacture." Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 246, 20 Sup. Ct. 96, 109 (44 L. Ed. 136).

Indeed, the established rule is that "interstate commerce," within the meaning of that term in the Constitution and the Anti-Trust Act, embraces far more than the mere sale, exchange, and interstate transportation of the goods. It includes intercourse, it comprehends every contract, trade, and dealing between citizens of one state and those of another which contemplates the transportation of goods, persons, or information from one state into another, and every initiatory, negotiating, and intervening act of the parties to that trade or deal from the time the intercourse relating to it commences until the transportation and delivery have been completed. Butler Bros. Shoe Co. v. United States Rubber Co., 156 Fed. 1, 17, 84 C. C. A. 167; International Text-Book Co. v. Pigg, 217 U. S. 91, 107, 30 Sup. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103; Dahnke-Walker Milling Co. v. Bondurant, 257 U. S. 282, 42 Sup. Ct. 106–108, 66 L. Ed. 239; United States v. Reading Co., 226 U. S. 324, 367, 368, 33 Sup. Ct. 90, 57 L. Ed. 243; Hopkins v. United States, 171 U. S. 578, 598, 19 Sup. Ct. 40, 43 L. Ed. 290; United States v. Swift & Co. (C. C.) 122 Fed. 529, 531; Welton v. State of Missouri, 91 U. S. 275, 23 L. Ed. 347; Caldwell v. North Carolina, 187 U. S. 622, 629, 23 Sup. Ct. 229, 47 L. Ed. 336; United States v. Tucker (D. C.) 188 Fed. 741, 742; Marienelli v. United Booking Offices of America (D. C.) 227 Fed. 165; In re Selman Heating & Plumbing Co. (D. C.) 204 Fed. 839, 840, 841–843; Robbins v. Shelby Taxing District, 120 U. S. 489, 497, 7 Sup. Ct. 592, 30 L. Ed. 694; Globe Elevator Co. v. Andrew (C. C.) 144 Fed. 881, 882.

[2] Under these authorities the contracts evidenced by the unfilled orders were contracts and transactions in interstate commerce. The acts of the customers in sending the orders were initiatory acts in contracts in interstate commerce. The receipt and acknowledgment of the receipt of the orders, the manufacture of the goods pursuant thereto, the packing, loading, shipping of them were intermediate steps and parts of, and the delivery and payment for the goods were the final steps of contracts and transactions in interstate commerce, and the direct restraint, and for a time the complete prevention and thereafter the partial prevention of the taking of these steps by the unlawful means used by the defendants proved by the evidence, whether that restraint was imposed upon the selling, the making, the packing, the loading, the shipping, or the transportation of the goods, was the very

restraint denounced by the Anti-Trust Act and brought the subject-matter of, the parties to the suit, and the relief the court granted far within the jurisdiction of the federal court under the Anti-Trust Act. Thus, Mr. Justice Harlan, delivering the prevailing opinion in Northern Securities Co. v. United States, 193 U. S. 197, 329, 24 Sup. Ct. 436, 453, 48 L. Ed. 679, said:

"In United States v. E. C. Knight Company [156 U. S. 1], it was held that the agreement or arrangement there involved had reference only to the manufacture or production of sugar by those engaged in the alleged combination, but if it had directly embraced interstate or international commerce, it would then have been covered by the Anti-Trust Act and would have been illegal."

And in Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 242, 20 Sup. Ct. 96, 107 (44 L. Ed. 136), the Supreme Court said:

"When Congress has enacted a statute such as the one in question, any agreement or combination which directly operates, not alone upon the manufacture, but upon the sale, transportation and delivery of an article of interstate commerce, by preventing or restricting its sale, etc., thereby regulates interstate commerce to that extent and to the same extent trenches upon the power of the national Legislature and violates the statute."

The execution of the combination or conspiracy of the defendants had exactly that effect. It directly operated and that operation was its patent and inevitable effect, not alone upon the manufacture, but upon the sale, transportation, and delivery of the articles the plaintiffs had contracted to sell, make and deliver in interstate commerce.

Moreover, the evidence establishes the facts that for years the plaintiffs had been and were, when the operation of the defendants' combination stopped them, continuously conducting vast currents or streams of interstate commerce in such articles as they contracted to sell, make, and deliver from the state of Missouri into other states where their customers received them. The evidence shows that the great body of the goods the plaintiffs sold, made, and delivered were sold and shipped to customers in other states than Missouri; that two of the plaintiff sold goods of the value of $2,950,000. per year; and that while the exact volume of the business of the other three does not appear, it is a fair inference from the proof that the five plaintiffs were pouring into the channels of interstate commerce goods of the value of at least $2,500,000 per annum. This course of business determined and demonstrated that the transactions of these plaintiffs in causing and conducting these currents including the order contracts for the sale, making, transportation, and delivery of the goods in other states, the selling, the manufacture, the loading, shipping, and delivery of these goods at their destinations constituted interstate commerce: Stafford v. Wallace, 258 U. S. ——, 42 Sup. Ct. 401, 402, 403, 66 L. Ed. ——; Dahnke-Walker Milling Co. v. Bondurant, 257 U. S. 282, 42 Sup. Ct. 106, 109, 66 L. Ed. 239; Lemke v. Farmers' Grain Co., 258 U. S. 50, 42 Sup. Ct. 244, 247, 66 L. Ed. ——; Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518; Eureka Pipe Line Co. v. Hallanan, 257 U. S. 265, 42 Sup. Ct. 101, 102, 103, 66 L. Ed. 227; United Fuel Gas Co. v. Hallanan, 257 U. S. 277, 42 Sup. Ct. 105, 106, 66 L. Ed. 234. "When cattle are sent for sale from a place in one state,

with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the states, and the purchase of the cattle is a part and incident of such commerce. What we say is true at least of such a purchase by residents in another state from that of the seller and of the cattle." Swift & Co. v. United States, 196 U. S. 398, 399, 25 Sup. Ct. 276, 280 (49 L. Ed. 518). And where customers in other states order goods to be made by sellers in Missouri and shipped to them in the other states, sellers accept such orders, agree to so sell, make, and ship the goods and do so, and this is a typical constantly recurring course of action, the current thus existing is a current of commerce among the states and the manufacture of the goods pursuant to the contracts is as much a part of that interstate commerce as is the contract of sale or the loading, the shipment, or the delivery. "The application of the commerce clause of the Constitution in the Swift Case was the result of the natural development of interstate commerce under modern conditions. It was the inevitable recognition of the great central fact that such streams of commerce from one part of the country to another, which are ever flowing, are in their very essence the commerce among the states and with foreign nations, which historically it was one of the chief purposes of the Constitution to bring under national protection and control." Stafford v. Wallace, 258 U. S. ——, 42 Sup. Ct. 403, 66 L. Ed. ——.

[3] The rights of the plaintiffs to keep their business running, to the continuous flow of their currents of interstate commerce, were property rights which they were legally entitled to exercise. Quinlivan v. Dail-Overland Co. (C. C. A.) 274 Fed. 56, 66; Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461; King v. Weiss & Lesh Mfg. Co., 49 App. D. C. 377, 266 Fed. 257, 260.

[4, 5] Counsel argue that the defendants had no purpose to restrain the interstate commerce of these plaintiffs, that their only purpose was to force the plaintiffs to employ none but union men and to grant other demands which the defendants made, but one can hardly wink so fast as not to see that the real purpose of their prevention of the plaintiffs from manufacturing the articles they had contracted to sell, make, and deliver in interstate commerce, and their prevention of the flowing of the currents of these articles in interstate commerce was to deprive the plaintiffs of their income from the sales and deliveries of the goods, and by this continuing loss of income to compel the submission of the plaintiffs to their demands. Moreover, the natural and inevitable effect of the prevention by the defendants of the making by the plaintiffs of the articles they had made interstate contracts to sell, make, and deliver was the prevention of their performance of their contracts and the prevention or partial prevention of their interstate commerce, and this result was so evident and unavoidable that the defendants could not have failed to know, to purpose, and to intend that this should be the result. "The conspirators must be held to have

intended the necessary and direct consequences of their acts and cannot be heard to say the contrary. In other words, by purposely engaging in a conspiracy which necessarily and directly produces the result which the statute is designed to prevent, they are, in legal contemplation, chargeable with intending that result." United States v. Patten, 226 U. S. 525, 543, 33 Sup. Ct. 141, 145 (57 L. Ed. 333, 44 L. R. A. [N. S.] 352); Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 245, 256, 257, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 213, 20 Sup. Ct. 96, 44 L. Ed. 136; Duplex Co. v. Deering, 254 U. S. 443, 463, 467, 468, 41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196. The defendants cannot be credited here with an innocent purpose or intent, and even if they could be they were guilty of combining to use and of using unlawful means, assaults, threats, too many pickets, following employés to their homes, and like intimidating acts that scared the plaintiffs' employés to leave them and prevented those desiring employment from taking it. A combination or conspiracy to use unlawful means to accomplish a lawful purpose, and its execution by the use of such means, is as violative of the act as a conspiracy to accomplish an unlawful purpose by lawful means.

[6] It is contended that because manufacture is not commerce and is not interstate commerce, the restriction or prevention of the manufacture of articles which, by interstate commerce contracts and transactions, sellers have agreed to sell, make, transport to, and deliver in other states, and the prevention of existing interstate commerce in such articles in this way, is not remediable by federal courts under the Anti-Trust Act. It is true that manufacture alone is not interstate commerce. But it is equally true that when manufacture becomes an essential part of or an indispensable step in the execution of an interstate commerce contract or transaction, or in the continuously flowing current of interstate commerce, as such manufacture was and is in this case, it becomes a part of or step in that interstate commerce to such an extent that a federal court of equity is vested with the power and is subject to the duty to enjoin the execution of a combination or conspiracy to prevent or practically prevent the performance of such contracts or to prevent or drastically restrict such interstate commerce by preventing the manufacture which constitutes one of its indispensable intermediate steps or parts. While manufacture alone is not interstate commerce, neither is buying or selling or contracting to buy or sell the goods or loading or packing or shipping the goods, when considered by itself alone, interstate commerce; yet each and all of these may become parts of and steps in interstate commerce, and when they so become, the restriction or prevention of these steps, which has the necessarily intended direct and inevitable effect of stopping or drastically restraining that interstate commerce by the execution of the conspiracy to restrain or destroy it, may be lawfully enjoined by a federal court.

In United Mine Workers of America et al. v. Coronado Coal Co. et al., 258 U. S. ——, 42 Sup. Ct. 570, at page 583, 66 L. Ed. ——, the Supreme Court, summing up the relation of coal mining to interstate commerce, said:

"Coal mining is not interstate commerce and obstruction of coal mining, though it may prevent coal from going into interstate commerce, is not a restraint of that commerce, unless the obstruction to mining is intended to restrain commerce in it, or has necessarily such a direct, material, and substantial effect to restrain it that the intent reasonably must be inferred."

The corollary conclusively follows that if the obstruction to coal mining is intended to restrict interstate commerce or necessarily has such a direct material and substantial effect to restrain it that the intent reasonably must be inferred, then such an obstruction to coal mining is an unlawful restraint to interstate commerce. So, while manufacture is not interstate commerce, its relation to interstate commerce is governed by the same rule. If the obstruction to it is intended directly to restrain interstate commerce, or if such obstruction necessarily has such a direct, material, and substantial effect to restrain it, that the intent so to do reasonably must be inferred, then such obstruction to manufacture is a direct restraint of interstate commerce remediable by the federal court under the Anti-Trust Act. The case in hand falls directly under this rule. The obstruction and prevention of the manufacture of the articles which the plaintiffs had made interstate commerce contracts to make, sell, and deliver, and to pour into their continuously existing currents of interstate commerce, could not have been made without the knowledge of the defendants that their direct, material, necessary, substantial, and inevitable effect would be to restrain or to prevent the plaintiffs' interstate commerce in such articles and thus to deprive them of their income; nor could it have been made without their reasonably inferred intent and purpose to obtain that result.

While the law governing cases of this class is the same in all cases, the conspiracies alleged, the evidence to sustain them, and the results in the various cases necessarily differ. In the case last cited, as that case was stated and treated by the Supreme Court, the gravamen of the charge of the conspiracy was to monopolize all interstate commerce in coal in the United States, and to prevent any interstate trade or commerce in the coal produced from nonunion mines. Thus the court said:

"The plaintiffs charge that there has been and is a continuously operating conspiracy between union coal operators and the International Union to restrain interstate commerce in coal and to monopolize it."

And it held that the plaintiffs were not entitled to recover against district No. 21 because "in a national production of from 10,000,000 to 15,000,000 tons a week, or in a production in district No. 21 of 150,000 tons a week, 5,000 tons a week, which the Bache-Denman mines in most prosperous times could not exceed, would have no appreciable effect upon the price of coal or nonunion competition." 258 U. S. ——, 42 Sup. Ct. 570, 582, 584, 66 L. Ed. ——. And the court defeated the plaintiffs in that case because their entire production of coal was so small in proportion to the entire production in the nation that the complete prevention of the plaintiffs' production could not have had any direct material effect on the alleged attempt to monopolize all the coal production of the nation. In the case before this court now, the grava-

men of the complaint is, not that the defendants attempted to monopolize all interstate commerce, but that the defendants conspired and were executing that conspiracy by unlawful means to prevent if possible, and to restrain as far as possible the flow of the plaintiffs' existing continuous currents of interstate commerce and the performance of the interstate commerce contracts which they had made to sell, make, and deliver the articles which were the subjects of that commerce to customers in states other than Missouri.

It was not essential to the right of the plaintiffs to relief by injunction by the court below that the object or effect of the defendants' conspiracy and its execution should obstruct all interstate commerce or all interstate commerce in that class of articles with which the plaintiffs were conducting interstate commerce, or that it should increase the price of such articles throughout the country. It was sufficient that the defendants' conspiracy was with the necessarily inferred intent, and that, as unlawfully executed by them, it had the effect directly and substantially to interfere with, restrain, and obstruct the large volume of interstate commerce which the plaintiffs were conducting to their irreparable injury. In the absence of the Anti-Trust Act, the plaintiffs had the right to conduct this interstate commerce. Congress has imposed no restraint upon it or them. The failure of Congress to impose any restriction on this commerce was in effect a declaration by that body that this interstate commerce should be free and untrammeled. Welton v. State of Missouri, 91 U. S. 275, 279, 282, 23 L. Ed. 347; Brown v. Houston, 114 U. S. 622, 631, 5 Sup. Ct. 1091, 29 L. Ed. 257; Walling v. Michigan, 116 U. S. 446, 455, 456, 6 Sup. Ct. 454, 29 L. Ed. 691.

Not satisfied that this declaration by inaction was sufficient, the Congress granted to the federal courts the power to protect the freedom of this interstate commerce by the Anti-Trust Act. That act provides that—

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal." (Comp. St. § 8820.)

In the succeeding section it denounces the monopolization of any part of trade or commerce among the states. While monopolies of interstate commerce and of parts of that commerce thus fall under the ban of the act, it denounces with equal force, clearness, and particularity every combination and conspiracy which directly and unreasonably restrains, interferes with, or obstructs, although it does not monopolize, or tend to monopolize, interstate commerce or any class of it. Direct and substantial restraint, obstruction, or destruction of interstate commerce, or of substantial parts of it, pursuant to a conspiracy or combination, is as violative of the act as a monopoly thereof.

In the Debs Case, 158 U. S. 564, at page 581, 15 Sup. Ct. 900, at page 905 (39 L. Ed. 1092), Mr. Justice Brewer said:

"It is curious to note the fact that in a large proportion of the cases in respect to interstate commerce brought to this court the question presented was of the validity of state legislation in its bearings upon interstate commerce, and the uniform course of decision has been to declare that it is not within the competency of a state to legislate in such a manner as to obstruct

interstate commerce. If a state with its recognized powers of sovereignty is impotent to obstruct interstate commerce, can it be that any mere voluntary association of individuals within the limits of that state has a power which the state itself does not possess?"

If the state of Missouri, by means of an act of its Legislature, had attempted to impose the restraint and obstruction upon interstate commerce which the defendants, through their conspiracy placed upon it in this case, the federal court, upon a proper application, would without doubt have prevented the success of such an endeavor. That restraint and obstruction by the defendants clearly denounced as it is by the express terms of the Anti-Trust Act is much less justifiable than it would have been if imposed by the state.

Evidence of the interstate contracts, of the plaintiffs' currents of interstate commerce, of the unlawful acts of the defendants, of the times and manners of their commission, and of their direct and inevitable effect in preventing the performance of the plaintiffs' interstate commerce contracts, and in obstructing the currents of their interstate commerce, fully sustained the finding by the court below of the formation and existence of the conspiracy, of its execution by unlawful means, and of its inevitable effect, and well warranted the issue of the injunction.

In Gable v. Vonnegut Machinery Co. (C. C. A.) 274 Fed. 66, 71, 72, the complainant, the Vonnegut Machinery Company, was the agent of the defendant, the Toledo Machine & Tool Company, the manufacturing company, under a contract with the plaintiff to pay the latter $7\frac{1}{2}$ per cent. on the sale of the plaintiff's production in states other than that of the tool company. Complainant brought suit and obtained an injunction against the tool company and some of its striking employés on the ground that the latter had formed and were operating a combination to prevent and which did prevent the tool company from manufacturing its usual production, and thereby restrained its interstate commerce and deprived complainant of its commission under its contract. The court held that the Vonnegut Company must be aligned with the tool company and not against it. And that court finally held that—

"The record before us is barren of evidence that the object of the strike was to interfere with interstate commerce. So far as appears, either directly or inferentially, the strikers' only object was to obstruct the operation of the tool company's plant." 274 Fed. at page 74.

On the other hand, in the case at bar the evidence convinces that the obstruction of the manufacture imposed by the defendants' combination and its execution by means of their unlawful acts necessarily had such a patent, inevitable, direct, and substantial effect in obstructing and preventing the plaintiffs' interstate commerce, that their intent to stop it, and if they could not stop it to restrain it as much as possible, must be reasonably inferred.

Counsel for the defendants cite Crescent Oil Co. v. State of Mississippi, 257 U. S. 129, 42 Sup. Ct. 42, 66 L. Ed. 166, which did not arise under the Anti-Trust Act but involved the question whether a cotton gin operating in Mississippi and ginning cotton which the owner of the

gin had bought and caused to be shipped to it from another state was an instrumentality of interstate commerce in such a sense as to withdraw it from the regulatory power of the state; Hammer v. Dagenhart, 247 U. S. 251, 268, 38 Sup. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, which involved the constitutionality of the act of Congress to regulate the transportation in interstate commerce of articles produced by child labor; Capital Dairy Co. v. Ohio, 183 U. S. 238, 22 Sup. Ct. 120, 46 L. Ed. 171, which questioned the constitutionality of the legislation of Ohio relating to oleomargarine; Diamond Glue Co. v. United States Glue Co., 187 U. S. 611, 23 Sup. Ct. 206, 47 L. Ed. 328, wherein the constitutionality, as against contracts made before its passage, of an act of the state of Wisconsin requiring corporations incorporated elsewhere to file copies of their charters, to pay small fees, and to meet certain other requirements as a condition of doing business in that state, was involved, and other authorities less relevant including those adjudging the time when articles flowing in the currents of interstate commerce make their entrance and exit from it and determining the line of demarcation between the exclusive power of the United States under the commerce clause of the Constitution and the police and regulatory powers of the states. In the opinions in many of these cases cursory remarks may be found about the relation of manufacture to interstate commerce and to commerce, but they fall under the familiar rule that the authority of expressions and statements in the opinions of courts is always limited to the specific question which they were considering and deciding when they were used. Cohens v. Virginia, 6 Wheat. 264, 399, 5 L. Ed. 257; United States v. Wong Kim Ark, 169 U. S. 649, 679, 18 Sup. Ct. 456, 42 L. Ed. 890; Traer v. Fowler, 144 Fed. 810, 817, 75 C. C. A. 540.

On the other hand, the Supreme Court has repeatedly sustained suits in equity under the Anti-Trust Act to enjoin the operation of combinations to restrain or obstruct interstate commerce by restraining or obstructing manufacture that constituted a part of or a step in such commerce. Addyston Pipe & Steel Co. v. United States, 175 U. S. 212, 240, 241, 246, 20 Sup. Ct. 96, 44 L. Ed. 136; Montague & Co. v. Lowry, 193 U. S. 38, 45; [1] American Column & Lumber Co. v. United States, 257 U. S. 377, 42 Sup. Ct. 114, 66 L. Ed. 284. In Pennsylvania Sugar Refining Co. v. American Sugar Refining Co., 166 Fed. 254, 256, 258, 259, 92 C. C. A. 318, the plaintiff corporation which had been engaged in importing raw sugar into Pennsylvania, there manufacturing it into refined sugar, selling and shipping it to customers in other states and countries, had ceased to do business during the Spanish War. That corporation, after consideration, formed the intention of engaging in business of that character again. The defendant corporation which was engaged in the same class of business conspired with one Segal, who held a majority of the stock of the plaintiff, to prevent the latter from again commencing the business contemplated, by making a large loan to Segal, taking his stock and the authority to vote it as security for the payment of the loan, and by the exercise of this voting power prevented the plaintiff from again commencing its business of manufacturing and selling refined sugar in interstate commerce. The plaintiff's action was for treble damages under the seventh

[1] 24 Sup. Ct. 307, 48 L. Ed. 608.

section of the Anti-Trust Act.  U. S. Comp. Stat. § 8829.  The first defense was that the conspiracy charged related to manufacture and was consequently exempt from the prohibition of the Anti-Trust Act, and United States v. E. C. Knight, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, was cited.  But the Circuit Court of Appeals of the Second Circuit held that the conspiracy was not violative of the act in the Knight Case only because it did not directly restrain interstate commerce, but that the alleged conspiracy in the Pennsylvania Refining Company's Case to prevent the latter from manufacturing, selling, and shipping refined sugar at all naturally, directly, and inevitably restrained interstate commerce and entitled the plaintiff to relief under the Anti-Trust Act.

When the combination or conspiracy of the defendants in this case was formed and when its execution commenced by the strike, by the withdrawal at one time of nearly all the plaintiffs' workmen, the quick picketing with too many pickets of their plants, and the complete stoppage of their manufacture for the time being, the plaintiffs had made unfilled interstate commerce contracts, to sell, make, and ship to their customers in other states goods of the value of more than $300,000. They had existing continuously flowing currents of interstate commerce from Missouri to other states in the nation which carried their goods of the value of more than $2,500,000 per annum.  In the execution of their combination, by too many pickets, by intimidation by numbers, by threats, by following to their homes, and by other unlawful and violent acts, the defendants scared many of the plaintiffs' remaining employés into withdrawing from their employment, and deterred those who wished to work for the plaintiffs from taking employment to such an extent that until they were restrained by the preliminary order of the court below they prevented the making of the articles the plaintiffs had contracted to sell, make, and deliver in interstate commerce and stopped the flow of the plaintiffs' currents thereof.  And after the restraining order was issued they continued the execution of their conspiracy and their unlawful acts to such an extent that they continued to obstruct and restrain to a very large and damaging extent the amount of the plaintiffs' manufacturing and of their interstate commerce, so that but a small per cent. of their normal currents of interstate commerce could flow.  The necessary and inevitable effect of this prevention and restriction of the making of the articles the plaintiffs had contracted to make, sell, and deliver, was to prevent for a time and drastically restrain their interstate commerce.  The defendants' purpose to prevent the plaintiffs' manufacture in order to compel them to employ none but union men and to grant other demands could not have been unaccompanied with their intent and purpose to prevent, if possible, and, if not, to restrict their interstate commerce and thus to stop or diminish their income, for only by such stoppage or diminution would the stoppage or restriction of manufacturing inflict the compelling injury they sought to impose.  The defendants are estopped from denying the necessary direct inevitable effect of their acts.  The prevention for a time and the subsequent restriction of the intermediate step of manufacturing the articles the plaintiffs had contracted to sell, make,

and deliver in interstate commerce necessarily had such a direct, material, substantial, and inevitable effect to restrain the interstate commerce of the plaintiffs that the defendants' purpose and intent so to do must be reasonably inferred, both as a matter of fact and as a matter of law; as a matter of fact, because the evidence produces an abiding conviction that such was the intent and purpose of the defendants, and as a matter of law because they are estopped from denying that they had the intent and purpose to produce the direct, natural, necessary, and inevitable consequences of their acts. The decree below must accordingly be, and it is

Affirmed.

Reference is made to the opinion of this court in Silverstein v. Local No. 280, of the Journeymen Tailors' Union, et al., 284 Fed. 833, which is filed herewith.

STONE, Circuit Judge (dissenting). This is an appeal by a labor organization, certain officials and members thereof from a final decree of injunction.

Appellants contest the jurisdiction of the court as a federal court. There is no longer room to question the applicability of the Sherman Act, within the limits of the Clayton Act (38 Stat. 730), to labor organizations and strikes. But the Sherman Act relates solely to interstate commerce, and the contention made here is that this conspiracy has no legal connection with interstate commerce. The facts necessary bearing on this jurisdictional question are as follows: Appellees are trunk manufacturers. A part of their products are shipped in interstate commerce. Appellants desired to unionize the plants of appellees. If peaceful means failed, they designed to call a strike and so picket the plants as to prevent their operation until the appellees would submit to unionizing the plants. In pursuance of this plan, strikes were called and picketing put in operation. The evidence substantially shows that this picketing was conducted in an unlawful manner. No attempt was made to prevent appellees from shipping any manufactured products or from receiving any raw material. There was no boycott of appellees' products or customers, no interference with interstate transportation, no purpose to interfere with such commerce. The conspiracy was confined to preventing manufacture. The purpose of the conspiracy was to accomplish unionization by preventing manufacture and in no way include as an object preventing appellees, by boycott or otherwise, from purchasing, selling, sending, or receiving products or materials. The jurisdictional question turns, therefore, on the point of whether a conspiracy for the sole purpose of unionizing a manufacturing plant is a restraint of interstate commerce because some of the articles which are prevented from being made are intended for interstate commerce and would normally enter therein.

My Associates deem this situation reveals a conspiracy to interfere with interstate commerce, within the meaning of the Sherman Act. The points they make in their able opinion are: (1) That the manufacture of articles contracted, intended, or normally going into interstate commerce, constitutes a part of interstate commerce; (2) that where the purpose of the conspiracy is to prevent the manufacture of

such articles, the inevitable effect is to interfere with interstate commerce, therefore an intent to so interfere must be inferred and the conspirators be estopped from denying that such was the actual intent; (3) that the means of executing the conspiracy were unlawful. I cannot concur in these views or the conclusion reached, because I think controlling decisions of the United States Supreme Court are to the contrary.

As to the contention that because an article is contracted for, intended for, or normally enters into interstate commerce, the manufacture of it is a part of interstate commerce. This conclusion is based upon the argument that if the manufacture is prevented, the article cannot enter interstate commerce, and therefore manufacture is an "intermediate step" in and an integral part of such commerce. This is patently true as a result of logical reasoning, but is it true when the problem before the court is to define that somewhat difficult line which separates the powers of the nation over interstate commerce from the powers of the states over intrastate commerce and internal police regulation? Such a problem must be solved along "practical" as well as logical lines. As said in Diamond Glue Co. v. U. S. Glue Co., 187 U. S. 611, at page 616, 23 Sup. Ct. 206, at page 208 (47 L. Ed. 328):

"In modern societies every part is related so organically to every other, that what affects any portion must be felt more or less by all the rest. Therefore, unless everything is to be forbidden and legislation is to come to a stop. it is not enough to show that, in the working of a statute, there is some tendency, logically discernible, to interfere with commerce or existing contracts. Practical lines have to be drawn and distinctions of degree must be made. See, further, Kidd v. Pearson, 128 U. S. 1, 21; Coe v. Errol, 116 U. S. 517, 525, 527; Tredway v. Riley, 32 Neb. 495."

If this were otherwise, as said, in Hammer v. Dagenhart, 247 U. S. 251, at page 272, 38 Sup. Ct. 529, at page 531 (62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724), "all manufacture intended for interstate shipment would be brought under federal control to the practical exclusion of the authority of the states, a result certainly not contemplated by the framers of the Constitution when they vested in Congress the authority to regulate commerce among the states. Kidd v. Pearson, 128 U. S. 1, 21."

In both of the preceding quotations, citation is made of Kidd v. Pearson, 128 U. S. 1, 21, 9 Sup. Ct. 6, 32 L. Ed. 346. The reasoning contained in that citation, approved in these later cases, as set out on page 21 of 128 U. S., on page 10 of 9 Sup. Ct. (32 L. Ed. 346), is as follows:

"If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested, to the exclusion of the states, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? Does not the wheat grower of the Northwest, and the cotton planter of the South, plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in Congress and denied to the states, it would follow as an inevitable result that the duty would devolve on Congress to regulate all of these deli-

cate, multiform, and vital interests—interests which in their nature are and must be, local in all the details of their successful management.

"It is not necessary to enlarge on, but only to suggest the impracticability of such a scheme, when we regard the multitudinous affairs involved, and the almost infinite variety of their minute details.

"It was said by Chief Justice Marshall, that it is a matter of public history that the object of vesting in Congress the power to regulate commerce with foreign nations and among the several states was to insure uniformity of regulation against conflicting and discriminating state legislation. See, also, County of Mobile v. Kimball, supra, at page 697.

"This being true, how can it further that object so to interpret the constitutional provision as to place upon Congress the obligation to exercise the supervisory powers just indicated? The demands of such a supervision would require, not uniform legislation generally applicable throughout the United States, but a swarm of statutes only *locally applicable and utterly inconsistent*. Any movement toward the establishment of rules of production in this vast country, with its many different climates and opportunities, could only be at the sacrifice of the peculiar advantages of a large part of the localities in it, if not of every one of them. On the other hand, any movement toward the local, detailed, and incongruous legislation required by such interpretation would be about the widest possible departure from the declared object of the clause in question. Nor this alone. Even in the exercise of the power contended for, Congress would be confined to the regulation, not of certain branches of industry, however numerous, but to those instances in each and every branch where the producer contemplated an interstate market. These instances would be almost infinite, as we have seen; but still there would always remain the possibility, and often it would be the case, that the producer contemplated a domestic market. In that case the supervisory power must be executed by the state; and the interminable trouble would be presented, that whether the one power or the other should exercise the authority in question would be determined, not by any general or intelligible rule, but by the secret and changeable intention of the producer in each and every act of production. A situation more paralyzing to the state governments, and more provocative of conflicts between the general government and the states, and less likely to have been what the framers of the Constitution intended, it would be difficult to imagine."

In applying this rule of practical logic to the question of whether or not manufacture of an article of interstate commerce is, as such, a part of interstate commerce, I find, as it seems to me, a long unbroken line of decisions to the effect that it is not. These decisions, many in number, began in 1885 with Coe v. Errol, 116 U. S. 517, 6 Sup. Ct. 475, 29 L. Ed. 715, and came down to June, 1922, with the noted case of United Mine Workers of America v. Coronado Coal Co.

From these cases I will select a few quotations which, in my judgment, sustain the view that manufacture of articles to be shipped in interstate commerce is not a part of interstate commerce within the meaning of the Constitution, as construed by the Supreme Court. I am impelled to do so by my high regard for the ability and learning of the judges with whom I feet compelled to differ in this case. I shall endeavor, carefully, to choose, and italicize in part, extracts which were not merely vagrant expressions of the court but such as were made directly applicable to determination of the issues there involved.

In the United Mine Workers' Case, supra (decided June 5, 1922), this court was reversed for holding that mining coal was interstate commerce. The facts and issues in that case seem to me directly controlling here. There was a strike the purpose of which was to unionize the mines in a certain locality. Here the strike was to unionize certain

trunk factories, all of which were located in St. Louis, Mo.   Unlawful means were there, as here, used to carry on the strike; the only difference being that in that case such means went to the further extent of murder, riot, and arson.   In that case, Chief Justice Taft, for the court, said:

"Coal mining is not interstate commerce, and the power of Congress does not extend to its regulation as such.   In Hammer v. Dagenhart, 247 U. S. 251, 272, we said: 'The making of goods and the mining of coal are not [interstate] commerce, nor does the fact that these things are to be afterwards shipped or used in interstate commerce make their production a part thereof. Delaware, Lackawanna & Western R. R. Co. v. Yurkonis, 238 U. S. 439.'   Obstruction to coal mining is not a direct obstruction to interstate commerce in coal, although it, of course, may affect it by reducing the amount of coal to be carried in that commerce."

In Lemke v. Farmers Grain Co. (decided February 27, 1922), the court said:

"Nor is this conclusion opposed by cases decided in this court and relied upon by appellants, in which we have had occasion to define the line between state and federal authority under facts presented which required a definition of interstate commerce where the right of state taxation was involved, or *manufacture* or commerce of an intrastate character was the subject of consideration.   In those cases we have defined the beginning of interstate commerce as that time, when goods begin their interstate journey by delivery to a carrier or otherwise, thus passing beyond state authority into the domain of federal control.   Cases of that type are not in conflict with principles recognized as controlling here."

In Crescent Cotton Oil Co. v. Mississippi (decided November 14, 1921), the Supreme Court considered the question of whether the Anti-Gin Act of Mississippi (Laws Miss. 1914, c. 162) interfered with interstate commerce.   On that point the court said:

"It is clear that these decisions cannot be of aid in determining the question we are now considering, which is whether a cotton gin operated by an oil company in Mississippi is rendered an instrumentality of interstate commerce by the fact that the owner of it ships out of the state, for its use in another state, all of the cotton seed which may be purchased in connection with its ginning operations.   *  *  *

"The separation of the seed from the fiber of the cotton, which is accomplished by the use of the cotton gin, is a short, but important, step in the manufacture of both the seed and the fiber into useful articles of commerce; *but that manufacture is not commerce* was held in Kidd v. Pearson, 128 U. S. 1, 20, 21; United States v. E. C. Knight, 156 U. S. 1, 12, 13; Capital City Dairy Company v. Ohio ex rel. Attorney General, 183 U. S. 238, 245; McCluskey v. Marysville & Northern Railway Company, 243 U. S. 36, 38, and in Hammer v. Dagenhart, 247 U. S. 251, 252; Arkadelphia Milling Company v. St. Louis & South Western Railway Company, 249 U. S. 134, 151, 152. *And the fact, of itself, that an article when in the process of manufacture is intended for export to another state does not render it an article of interstate commerce.*   Coe v. Errol, supra, and New York Central, etc., Company v. Mohney, 252 U. S. 152, 155.   When the ginning is completed, the operator of the gin is free to purchase the seed or not, and, if it is purchased, to store it in Mississippi indefinitely, or to sell or use it in that state, or to ship it out of the state for use in another, and, under the cases cited, *it is only in this last case, and after the seed has been committed to a carrier for interstate transport, that it passes from the regulatory power of the state into interstate commerce and under the national power.*

"The application of these conclusions of law to the manufacturing operations of the cotton gins, which we have seen precede, *but are not a part of,*

*interstate commerce,* renders it quite impossible to consider them an instrumentality of such commerce, which is burdened by the Anti-Gin Act, and the first contention of the plaintiff in error must be denied."

In Hammer v. Dagenhart, 247 U. S. 251, at page 272, 38 Sup. Ct. 529, at page 531 (62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724), the court said:

"When offered for shipment, and before transportation begins, the labor of their production is over, and the mere fact that they were intended for interstate commerce transportation does not make their production subject to federal control under the commerce power.

"Commerce 'consists of intercourse and traffic * * * and includes the transportation of persons and property, as well as the purchase, sale and exchange of commodities.' *The making of goods and the mining of coal are not commerce,* nor does the fact that these things are to be afterwards shipped or used in interstate commerce, make their production a part thereof. Delaware, Lackawanna & Western R. R. Co. v. Yurkonis, 238 U. S. 439.

"Over interstate transportation, or its incidents, the regulatory power of Congress is ample, but *the production of articles, intended for interstate commerce, is a matter of local regulation.*

" 'When the commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state.' (Mr. Justice Jackson in Re Green, 52 Fed. Rep. 113.) This principle has been recognized often in this court. Coe v. Errol, 116 U. S. 517; Bacon v. Illinois, 227 U. S. 504, and cases cited. If it were otherwise, all manufacture intended for interstate shipment would be brought under federal control to the practical exclusion of the authority of the states, a result certainly not contemplated by the framers of the Constitution when they vested in Congress the authority to regulate commerce among the states. Kidd v. Pearson, 128 U. S. 1, 21."

In Kidd v. Pearson, 128 U. S. 1, at page 20, 9 Sup. Ct. 6, at page 10 (32 L. Ed. 346), the court said:

"No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation. The legal definition of the term, as given by this court in County of Mobile v. Kimball, 102 U. S. 691, 702, is as follows: 'Commerce with foreign countries, and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation, and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities.' If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested, to the exclusion of the states, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? Does not the wheat grower of the Northwest, and the cotton planter of the South, plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in Congress and denied to the states, it would follow as an inevitable result that the duty would devolve on Congress to regulate all of these delicate,

multiform, and vital interests—interests which in their nature are and must be, local in all the details of their successful management.

"It is not necessary to enlarge on, but only to suggest the impracticability of such a scheme, when we regard the multitudinous affairs involved, and the almost infinite variety of their minute details."

In Capital City Dairy Co. v. Ohio, 183 U. S. 238, at page 245, 22 Sup. Ct. 120, at page 123 (46 L. Ed. 171), the court said:

"The contention that the statutes in question are repugnant to the commerce clause of the Constitution is manifestly without merit. All the acts of the corporation which were complained of related to oleomargarine *manufactured by it in the state* of Ohio, in violation of the laws of that state, and therefore operated on the corporation within the state and affected the product manufactured by it *before it had become a subject of interstate commerce.* Kidd v. Pearson, 128 U. S. 1; United States v. E. C. Knight Co., 156 U. S. 1. It results that the plaintiff in error is not in a position to assail the validity of the statutes, because of their supposed operation upon interstate commerce, and we are not called upon to express an opinion respecting the constitutionality of the statutes upon this assumption."

The cases from which the above quotations are taken, as well as the many other similar decisions cited in those cases, establish the doctrine that the manufacture of goods, which are to be later transported in interstate commerce, is not a part of interstate commerce.

As to the second point in the majority opinion, to wit, the intent to interfere with interstate commerce: It is undoubtedly the law that a conspiracy formed with the specific intent to interfere with (usually by restriction of) interstate commerce is within the domain of national control and subject to the Sherman Act. This is true irrespective of the means employed toward its execution. Because this is so, there are cases in which the act has been held applicable where the means happened to be control of or prevention of production of the particular article of interstate commerce. Such are American Column & Lumber Co. v. U. S., 257 U. S. 377, 42 Sup. Ct. 114, 66 L. Ed. 284 (decided December 19, 1921); U. S. v. Reading Co., 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243. But, in that character of cases, it was not the means employed to effectuate the conspiracy that brought it within the federal control. It was the specific, actually existing unlawful intent and purpose of the conspiracy which had that effect.

This record is entirely barren even of a suggestion that there existed here any actual intent to affect interstate commerce. The sole purpose of this strike was to benefit and strengthen the labor unions here involved by unionizing these particular plants. Of course, this was intended to be accomplished by curtailing and, if possible, preventing complainants from manufacturing their products. This was to be brought about by preventing them procuring the necessary labor except through employment of members of the union. But there was no specific purpose or intent to affect interstate commerce such as was alleged, for example, in the United Mine Workers' Case, supra. Nor is there a word of testimony tending to show that the respondents had any knowledge of or cared anything about whether the business of complainants was state or interstate in character. That consideration was unimportant to their purposes. Therefore, if an intent to inter-

fere with interstate commerce is to be found it must be imputed, as matter of law not fact, from the circumstances that to prevent this manufacture would naturally and inevitably prevent the products thereof going into interstate commerce.

It is generally true that men who do acts are presumed to intend the natural consequences thereof. But here again this logic and rule must be applied in a practical way. If it is not so applied, the entire police power of the states is in danger of absorption by the national government. This is true because, in our complex social and economic life, production, as well as manufacture, of all kinds of things is generally followed by entrance of those articles, or some of them, into interstate commerce. This necessity for having always in mind constitutional limitations in applying such rules of logic and law has been repeatedly recognized and laid down by the Supreme Court. The applied rule is that state laws or individual acts which affect interstate commerce incidentally are to be distinguished from those which affect it directly. The former are without, the latter are within, national control. United Mine Workers v. Coronado Coal Co., supra; U. S. v. Patten, 226 U. S. 525, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325; Ware & Leland v. Mobile County, 209 U. S. 405, 28 Sup. Ct. 526, 52 L. Ed. 855, 14 Ann. Cas. 1031; Hooper v. California, 155 U. S. 648, 15 Sup. Ct. 207, 39 L. Ed. 297; Leloup v. Mobile, 127 U. S. 640, 8 Sup. Ct. 1380, 32 L. Ed. 311; and many other cases.

Whether an act, a course of conduct, or a state statute affects interstate commerce incidentally or directly, within the above rule, depends upon the circumstances of each particular case. It is not shown, in this evidence, that the volume of interstate business of these complainants was such as to affect prices, in interstate commerce, of such goods. if these factories ceased their output. It is shown that they manufactured several million dollars worth of goods annually and that much of this went into interstate commerce. But we are not, in any way, advised what percentage or proportion this business bore to the entire volume of interstate business in such goods. I do not think we are authorized, with no evidence whatsoever, to say that interstate business, as a whole, in this kind of products would be affected by this strike, and thus attempt to sustain our jurisdiction by bringing this case within the rule of application as laid down in U. S. v. Patten, 226 U. S. 525, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325, and similar cases.

To my mind, the facts of this case are much stronger than the United Mine Workers' Case, supra, and there the Supreme Court found no jurisdiction, although it said:

"The circumstances are such as to awaken regret that, in our view of the federal jurisdiction, we cannot affirm the judgment."

The consequences of a legal rule are often useful in testing its accuracy. There can be no shadow of doubt as to the consequences of the rule laid down in the majority opinion. The natural, logical and inevitable result will be that every strike in any industry or even in any single factory will be within the Sherman Act and subject to

federal jurisdiction provided any appreciable amount of its product enters into interstate commerce. Moreover, if this be true as to the products produced in such industry or factory, it is entirely logical the same rule should apply to the raw materials used in such production if any of them are subjects of interstate commerce. In a practical sense, this would result in all strikes being subject to federal jurisdiction, because scarcely any factory is so small that some of its finished products do not enter into interstate commerce. And yet the Supreme Court has, within the six months, held that a strike in a mine shipping seventy-five percentum of its coal in interstate commerce and involving many miners and much property was without the federal jurisdiction (United Mine Workers' Case, supra), and that court has never departed from, but has repeatedly and recently affirmed, the doctrine, announced almost 40 years ago, that manufacturing of interstate products is not interstate commerce.

As to the third basis of the majority opinion—that the means employed to execute this conspiracy were unlawful: Such means included intimidation and violence. The unlawful character of intimidation and violence is beyond question, but that has nothing to do with the question of whether punishment therefor or prevention thereof should be in the state or in the federal courts. In the United Mine Workers' Case, supra, the means employed were far more vicious than here, including arson, riot, and murder. Yet it was not even suggested, in that bitterly contested case, that the means employed by the strikers had anything whatever to do with the jurisdiction of the court.

For the above reasons, I find myself unable to concur in the result or reasoning of my able Associates, and therefore dissent therefrom. I am further sustained by the case of Gable v. Vonnegut Machinery Co., 274 Fed. 66, recently decided by the Court of Appeals for the Sixth Circuit. In that case, by far the greater part of the products manufactured, in the plants affected, went into interstate commerce and contracts were in existence for much of such future product. In discussing the scope of the Sherman and Clayton Acts, that court said (page 73):

"Neither of these statutes furnishes a remedy against acts merely because they incidentally and indirectly affect interstate commerce; they apply only to acts which directly and immediately relate thereto. Manufacturing is not commerce. None of the cases cited support the theory that a manufacturer may invoke the jurisdiction of the federal court merely because a strike interferes with the manufacture of his products which are sold generally in interstate commerce."

The court further said (page 74):

"The record before us is barren of evidence that the object of the strike was to interfere with interstate commerce. So far as appears, either directly or inferentially, the strikers' only object was to obstruct the operation of the tool company's plant. The fact that shipment was interfered with, only because goods were not manufactured, merely incidentally and indirectly affected interstate commerce."